**In re VISTA VI, INC., Debtor and Debtor-In-Possession.**

**Bankruptcy No. B83–00917.**

United States Bankruptcy Court, N.D. Ohio, E.D.

Dec. 2, 1983.

Jerome Leiken, H. Jeffrey Schwartzberg, Benesch, Friedlander, Coplan & Aronoff, Cleveland, Ohio, for Great Northern Partnership.

Lewis Einbund, Sindell, Sindell & Rubenstein, Cleveland, Ohio, for Vista VI, Inc.

Harry W. Greenfield, Javitch & Eisen Co., L.P.A., Cleveland, Ohio, for General Host Corp.

Carter H. Donohoe, Cleveland, Ohio, for First Bank Nat. & Trust Co.

Marilyn Shea-Stonum, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for International Multifoods, Inc.

## MEMORANDUM OF OPINION

JOHN F. RAY, Jr., Bankruptcy Judge.

This matter is before the Court on the motion of Great Northern Partnership ("Great Northern") to require the debtor-in-possession, Vista VI, Inc. ("Vista"), to reject an unexpired lease, the evidence and briefs of counsel.

The issue for decision by this Court is whether Vista has breached its lease with Great Northern by not operating as a "Hickory Farms of Ohio" franchise, and whether Vista should, therefore, be required to reject its unexpired lease, since it cannot comply with the requirements of Section 365 of the Bankruptcy Code.[1]

### Questions Presented

1. Whether Vista has breached its lease with Great Northern.

2. Whether the provisions of the lease may be modified to permit Vista to assume the lease without literal compliance with all of the terms of the lease.

### Findings of Fact

1. On April 4, 1983, Vista filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. Vista's primary asset is an unexpired and unassigned lease of real property in a shopping center operated by Great Northern Partnership ("Great Northern").

2. Section 8 of the lease, entitled "USE AND CARE OF PREMISES BY TENANT," provides as follows:

(a) *Tenant's Use of Premises.* TENANT shall operate its business in the

1. Section 365 reads in pertinent part:
   . . . .
   (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
   (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
   (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
   (C) provides adequate assurance of future performance under such contract or lease.

   . . . .
   (3) For the purposes of paragraph (1) of this section, adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—
   (A) of the source of rent and other consideration due under such lease;
   (B) that any percentage rent due under such lease will not decline substantially;
   (C) that assumption or assignment of such lease will not breach substantially any provision, such as a radius, location, use, or exclusivity provision, in any other lease, financing agreement, or master agreement relating to such shopping center; and
   (D) that assumption of assignment of such lease will not disrupt substantially any tenant mix or balance in such shopping center.

PREMISES during the term of this LEASE or any extension or renewal thereof,

(i) under the name HICKORY FARMS OF OHIO; and

(ii) shall use the PREMISES only for the operation of a retail store to be used solely for the sale of meats, candies and cheeses, along with the sale of specialty food gift items and other sundry items normally sold by Hickory Farms of Ohio Stores, all for off premises consumption, except for the sampling of food products by customers.

TENANT agrees that it will not use, or permit or suffer the use of, the PREMISES, or any part thereof, for any other business or purpose....

3. On May 3, 1983, this Court issued a permanent injunction enjoining Vista from using the name "Hickory Farms of Ohio" to describe its business.

4. By letter dated April 19, 1983, John Hertvik, Jr., President of Vista, informed Great Northern of Vista's intent to continue operating its store under the name "The Gourmet Cheese Shoppe." All rents continued to be paid and are current as of the date of these proceedings.

5. By letter dated June 9, 1983, Susan L. Rotman, Assistant General Manager of Great Northern, informed Vista that it was in default of its lease, and demanded that the defaults be cured, or Great Northern would "exercise its rights under the lease."

6. By order dated July 1, 1983, Vista was permitted to use up to $170,000 in gross receipts from the sale of current inventory. These receipts constituted cash collateral of First Bank National & Trust Co., General Host Corporation and Kaukauna Cheese Co., secured creditors.

### Conclusions of Law

Vista has breached the use clause of its lease with Great Northern. The case of *Bevy's Dry Cleaners and Shirt Laundry, Inc. v. Strable,* 2 Ohio St.2d 250, 208 N.E.2d 528 (1965), cited by the debtor, is inapposite to the instant case. In *Bevy's,* the lease

provided the premises would be "used as a self-serve laundry." Since the court found no language which limited the lessee's use of the premises solely to a self-serve laundry, it held that similar or related uses were not prohibited by the lease's descriptive language. In the instant case, the lease specifies that the tenant "will not use ... the premises ... for any other business or purpose" other than as a Hickory Farms store. The intent of this clause was to prescribe the only permissible use of the premises, not merely to describe possible uses. The May 3, 1983 injunction makes it impossible for Vista to cure this breach. The only remaining issue is whether this Court may allow Vista to assume the lease without curing its default.

The provisions of Section 365(b) were intended to protect the rights of those who contract with debtors, by giving the non-debtor some semblance of the benefit of his bargain. *See* H.Rep. No. 95–595, 95th Cong., 1st Sess. 348–49 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Courts have not felt compelled to enforce all the terms of a contract, however, in order to give the non-defaulting party the benefit of his bargain. Where the lessee's benefit in continuing the lease outweighs the potential harm to the lessor, "... a bankruptcy court may exercise its equitable discretion to deny enforcement of a termination clause when termination of the lease would render an otherwise promising arrangement under Chapter XI impossible." *In re D.H. Overmyer Co.,* 510 F.2d 329, 332 (2d Cir. 1975); *see also In re Great Scott Food Market, Inc.,* 1 B.R. 223 (Bkrtcy.R.I.1979).

Under Section 70(b) of the 1898 Act, clauses which automatically terminated the contract, if one party filed a bankruptcy petition, were valid. In the new Bankruptcy Code, Section 365(e)(1) expressly invalidates such clauses, but the cases which attempted to apply Section 70(b) of the old Act demonstrate the general attitude of the courts toward forfeiture provisions. In *Queens Boulevard Wine & Liquor Corp. v. Blum,* 503 F.2d 202 (2d Cir.1974), the Second Circuit affirmed a bankruptcy court's refus-

al to enforce an automatic termination clause, since possession by the debtor did not unduly prejudice the landlord, while enforcement of the forfeiture clause would destroy the debtor's chances for reorganization and, thus, needlessly injure creditors who had furnished capital for the debtor's rehabilitation. The Third, Fourth and Ninth Circuits refused to enforce valid bankruptcy termination clauses when such enforcement would have harmed the reorganization attempt and provided a windfall for the landlord. *In re Huntington, Ltd.,* 654 F.2d 578 (9th Cir.1981); *Weaver v. Hutson,* 459 F.2d 741 (4th Cir.1972), *cert. denied,* 409 U.S. 957, 93 S.Ct. 288, 34 L.Ed.2d 227 (1973); *In re Fleetwood Motel Corp.,* 335 F.2d 857 (3d Cir.1964).

■ These cases, decided under the old Bankruptcy Act, demonstrate that bankruptcy courts are not required to enforce all of the terms of a lease where to do so would harm the debtor's reorganization attempt. Cases under the new Bankruptcy Code demonstrate that the courts have the power to refuse to enforce all of the provisions of a lease, and to allow assumption of a lease despite less than literal compliance with all lease terms. In *In re U.L. Radio Corp.,* 19 B.R. 537 (Bkrtcy.S.D.N.Y.1982), the bankruptcy court granted the debtor's motion to assume and assign its lease, even though the debtor was operating the store as a television sales and service center and the assignee wished to operate a small bistro. The lease contained a use clause providing that the premises could only be used as a television sales and service store. The court found that "[e]ven under the tightly drawn definition of adequate assurance in the shopping center case, Congress did not envision literal compliance with all lease creditors; insubstantial disruptions in, *inter alia,* tenant mix and insubstantial breaches in other leases or agreements were contemplated and allowed." 19 B.R. at 544.

In the recent case of *In re Libson Shops,* 24 B.R. 693 (Bkrtcy.E.D.Mo.1982), the debtor-in-possession, a tenant in a shopping center, sought approval of a bulk sale of debtor's merchandise in the form of a "going out of business" sale. The shopping center lease provided that the tenants would not conduct this type of sale. The bankruptcy court, noting that the Code authorized bankruptcy courts to compromise private rights which conflict with a debtor's ability to receive the full benefit of a reorganization or liquidation proceeding, refused to enforce the contract terms. The court found that the benefits to creditors and employees of the debtor outweighed the possible disruption to the tenant mix and profit/loss balances of other marginal tenants in the shopping center. Faced with a speculative harm to the lessor on one hand and a general policy in favor of assumption of leases by debtors on the other, the court held that the lessor's contract rights were unenforceable in bankruptcy proceedings.

■ Viewing Section 365 in light of earlier case law developed under the 1898 Act, it appears that Congress intended to allow the courts to balance the equities of each case, rather than forcing rigid adherence to the literal terms of the contract. While the rights of the non-defaulting party must be taken into consideration, these rights are subject to compromise in bankruptcy proceedings. Balancing the equities in this case, it seems clear that Vista ought to be allowed to assume the lease. Under the proposed reorganization, Vista has a real possibility of meeting its obligations to its creditors. Many of these creditors have extended credit to Vista, relying on Vista's continued operations in the Great Northern Mall. While Great Northern may lose some drawing power or prestige without the Hickory Farms name, this injury seems insubstantial when weighed against the injury to Vista and its other creditors.

Great Northern argues that special considerations arise when the lease at issue is a lease in a shopping center. Shopping centers, they argue, require special protection to preserve the "tenant mix"—the balance of stores within the mall which is designed to attract shoppers. To protect the tenant mix, Great Northern argues, literal compliance with Vista's lease is required. As evidence of congressional intent to require lit-

eral compliance with shopping center lease provisions, Great Northern cites proposed S. 549, 98th Cong., 1st Sess. (1983). This legislation is a response to perceived misapplications of Section 365(b)(3). To limit judicial discretion, the bill would delete the word "substantially" from Section 365(b)(3)(C) and (D). As amended, the statute would read:

(3) For the purposes of paragraph (1) of this section, adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—

. . . .

(C) that assumption or assignment of such lease will not breach [substantially] any provision, such as a radius location, use, or exclusivity provision, in any other lease, financing agreement or master agreement relating to such shopping center; and

(D) that assumption or assignment of such lease will not disrupt [substantially] any tenant mix or balance in such shopping center.

Though not binding on this Court until its enactment into law, S. 549 is entitled to consideration as evidence of the reaction of the drafters of the Bankruptcy Code to judicial interpretations of that Code. However, Great Northern's assertion that S. 549 tips the equities of this case in favor of literal compliance by Vista is misplaced for two reasons. First, it appears from the evidence introduced at trial that Great Northern has considered replacing Vista's store with a shoe store at the same location (Debtor's Ex. 1–P). A landlord who is willing to allow such disruptions in the tenant mix cannot argue that equity forbids the name change of the cheese shop proposed by the debtor.

Second, and more important, it appears that Great Northern has misinterpreted the intent of the drafters of S. 549. The report of the Senate Committee on the Judiciary indicates that the Senate is concerned with assignments which alter the tenant mix in shopping centers. The Senate appears willing to allow assignments which change the name of the tenant, but not its underlying business. The committee report points out:

Use clauses are not intended to prevent the assignment of leases and practice in the shopping center industry shows that they will be interpreted reasonably. Any attempt to preclude assignment by drafting a use clause which would apply only to the original tenant would be de facto prohibitions of assignment, and, therefore, would be unenforceable under section 365(f)(1).

S.Rep. No. 70, 98th Cong., 1st Sess. 16 (1983).

The proposed legislation is intended to prevent assignments which change the entire nature of the tenant's business. Examples mentioned in the Senate report include shifts from a men's wear to women's wear store, or from a grocery to a toy store. None of the potential problems listed in the report—over-saturation of a product market, unfair competition and rent imbalance among competitors [2]—would be created by allowing Vista to continue its lease. The basic tenant mix and competitive structure of Great Northern will not be affected.

Since no real harm to Great Northern would be caused by allowing Vista to continue its lease, and since rejection of the lease would make an effective reorganization all but impossible, the motion of Great Northern for an order to require Vista to reject its lease should be denied.